UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **EXXONMOBIL GLOBAL SERVICES CO., EXXON MOBIL CORP., and EXXONMOBIL RESEARCH & ENGINEERING CO.,** *Plaintiffs/Counter-Defendants,* | § § § § § § § § | |
| v. | § § | |
| **GENSYM CORP. & VERSATA ENTERPRISES, INC.,** *Defendants,* | § § § § | **CASE NO. 1:12-CV-442-JDR** |
| **GENSYM CORP.,** *Counter Plaintiff/Third-Party Plaintiff* | § § § § | |
| v. | § § | |
| **INTELLIGENT LABORATORY SOLUTIONS, INC.,** *Third-Party Defendant* | § § § § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is ExxonMobil Global Services Company, Exxon Mobil Corporation, and ExxonMobil Research and Engineering Company's (collectively "ExxonMobil") Motion for Partial Summary Judgment (Dkt. No. 11), to which Gensym Corporation ("Gensym") and Versata Enterprises, Inc. ("Versata") (collectively "Gensym") have responded (Dkt. No. 20) and ExxonMobil has replied (Dkt. No. 21).

**I. Factual and Procedural Background**

Gensym's G2 Software Platform is a technology tool on which computer software applications can be designed. Over the course of several years, ExxonMobil has built an alert system that is designed to run exclusively on the G2 Software Platform called "Abnormal Event Detection" and "Real-Time Advisory" (AED/RTA). ExxonMobil currently uses the AED/RTA

alert system at over thirty different refining and chemical plants that produce and store petroleum products and chemicals. According to ExxonMobil, the AED/RTA alert system provides an important line of defense to identify operational deviations; issue advance advisories to ExxonMobil personnel of potential process, equipment, and system failures; and recommend corrective actions before operational deviations can develop into more serious problems.

In 2007, ExxonMobil and Gensym entered into negotiations for a single license agreement for Gensym's G2 Software Platform to replace previous ad hoc, site-specific agreements between Gensym and various ExxonMobil entities. Effective April 1, 2008, ExxonMobil and Gensym entered into a License Agreement, the purpose of which was to "define the terms and conditions for the provision" of products and services by Gensym pursuant to future purchase orders. (The "License Agreement", Dkt. No. 11, Ex. 1 at 3, art. 1.) Exhibit C to the License Agreement defines "Products" as "[a]ll products made commercially available by Licensor to its customers including but not limited to: the G2 XOM Development Bundle" and sets forth two different licensing models under which products may be acquired: (1) individual licenses for each ExxonMobil facility or (2) a single, corporate-wide, commercially-restricted license. (License Agreement at 20, Ex. C.)

On or about April 11, 2008, ExxonMobil Research and Engineering Company (EMRE)[1] submitted a purchase order under the second option for a "corporate wide perpetual license for G2 XOM development bundle." (The "G2 Purchase Order," Dkt. No. 11, Ex. 2). ExxonMobil paid $960,000 for the G2 Software, which included "one initial year of Maintenance Services," also known as "Customer Support Service" (CSS). (License Agreement at 23, Ex. D.) After one

---

1. According to Gensym's response to ExxonMobil's motion, EMRE is the branch of ExxonMobil responsible for distributing software, providing support, and performing development of new applications with respect to the G2 Software Platform.

year, Maintenance Services were optional and could be purchased at ExxonMobil's discretion. (*Id.* at 11, Ex. C, § 6.6.)

Because the G2 Software Platform requires an access code in order to start, shortly after the License Agreement was signed, Gensym and ExxonMobil discussed how to handle the issue of access codes. At Gensym's request, the Parties decided that every 12 months, Gensym would provide ExxonMobil with temporary 18-month access codes ("annual access codes") that EMRE would distribute to ExxonMobil entities covered under the License Agreement. The reason for annual access codes was to ensure that the G2 Software Platform was not being used at unauthorized locations.

From 2008 to early 2011, things proceeded without incident. After the initial free year of Maintenance Services, ExxonMobil twice agreed to optional annual Maintenance Services at amounts set by a fee limitation provision in Exhibit D to the License Agreement. ExxonMobil paid $175,000 for maintenance services in 2009 and slightly more than $175,000 in 2010. Then in January 2011, just before ExxonMobil's annual maintenance subscription was set to expire, Gensym scheduled a telephone call with ExxonMobil in order to gather feedback regarding Maintenance Services. At that time, ExxonMobil informed Gensym that it was not satisfied with the level of support it was receiving from Gensym and that it wanted to expand support to allow non-EMRE employees to contact Gensym's help desk. This included adding employees at ExxonMobil's Baton Rouge facility, which was covered under a separate $30,000/year maintenance plan at that time. Gensym offered to provide that support, along with additional upgrades under a new three-level maintenance program that Gensym was rolling out to its customers, for $258,500. Citing the $200,000 cap for Maintenance Services in Exhibit D to the

License Agreement, ExxonMobil offered to pay $181,700, despite the fact that it wanted to expand Maintenance Services beyond the scope of the original License Agreement.

On March 31, 2011, as the Parties' negotiations stalled, ExxonMobil allowed its then-current contract for Maintenance Services to expire. On June 9, 2011, Gensym provided ExxonMobil with 30-days written notice that it was exercising its right to terminate the License Agreement pursuant to Article 2, Section 2.2 of the same. After the notice period expired, ExxonMobil was no longer permitted to place new orders under the License Agreement. ExxonMobil requested that Gensym reconsider its decision to terminate the License Agreement, but Gensym refused.

Meanwhile, many of ExxonMobil's annual access codes were set to expire in October 2011. Once that happened, ExxonMobil would no longer be able to use the G2 Software Platform. In anticipation of the annual access codes expiring, on August 1, 2011, ExxonMobil made its first written demand for permanent access keys. However, because ExxonMobil's contract for Maintenance Services had expired, Gensym represented to ExxonMobil that it would no longer be providing ExxonMobil with any access codes. (de Wit Dep., Dkt. No. 21, Ex. 7 at 92:8-17.) As a result, on August 29, 2011, ExxonMobil filed its Original Petition in 419th Judicial District of Travis County, Texas alleging breach of contract and declaratory relief in connection with the License Agreement, as well as injunctive relief requiring Gensym to provide ExxonMobil with permanent access codes to use the G2 Software Platform.

By letter dated September 8, 2011, Gensym responded that it "disagree[d] with [ExxonMobil's] stated position that it is entitled to use the G2 platform without payment of maintenance fees." (Dkt. No. 21, Ex. 4 at 1.) At that time, and in order to avoid a temporary injunction hearing on the issue, Gensym provided ExxonMobil with a temporary 3-month access

4

code and stated that it would continue to do so every three months for at least a year. (*Id.*) However, Gensym made it clear that its "willingness to provide access codes under these circumstances should not be construed as permission to use the G2 platform without payment of maintenance fees." (*Id.* at 2.)

On November 2, 2011, ExxonMobil amended its Petition, adding causes of action for fraudulent inducement and breach of warranty, both relating to the License Agreement. ExxonMobil again amended its Petition on January 31, 2012, making minor changes and adding Defendant Versata—Gensym's parent company—under an alter ego theory.

On February 24, 2012, Gensym counterclaimed, seeking a declaration from the Texas state court that ExxonMobil was in repeated material breach, or had failed to adequately cure a material breach, of the License Agreement. On May 17, 2012, Gensym filed its Amended Counterclaim, alleging breach of contract, tortious interference with contract, and copyright infringement against ExxonMobil. Gensym also brought claims against third party defendant Intelligent Laboratory Solutions, Inc., alleging breach of contract and copyright infringement.

Based on its claims under the federal Copyright Act, Gensym removed the action to this Court on May 17, 2012. ExxonMobil now moves for summary judgment concerning a number of issues of contractual interpretation that it claims can be decided as a matter of law.

## II. Legal Standards

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, Ltd. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-

movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "[T]he court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## B. Contract Construction

"Under the Texas Uniform Declaratory Judgments Act, a party to a written contract may seek a judicial determination of its contractual rights." *TC Dallas #1, LP v. Republic Underwriters Ins. Co.*, 316 S.W.3d 832, 837 (Tex. App.—Dallas 2010) (citing TEX. CIV. PRAC. & REM CODE § 37.004(a); *Hartman v. Sirgo Operating, Inc.*, 863 S.W.2d 764, 767 (Tex. App.— El Paso 1993, writ denied)). "When a contract is unambiguous and the dispositive facts are not in dispute, a court may grant summary judgment and render a declaratory judgment regarding the parties' rights under the contract." *Id.* (citing *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 131–32 (Tex. App.—Corpus Christi 2006, pet. denied) (granting summary judgment and rendering declaratory judgment regarding breach of unambiguous contract)).

Under Texas law, the construction of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). The court's main focus in interpreting a contract is to determine the mutual intentions of the parties as expressed in the written agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). The parties' intent must be taken from the contract itself, which must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W.3d 723, 726 (Tex. App.— Dallas 2006, pet. denied). The court should provide a construction that affords some consequences to each part of the agreement, so that none of its provisions are rendered meaningless. *Coker*, 650 S.W.2d at 394. Unless the contract shows that the parties used a term "in a technical or different sense," the court should give terms their "plain, ordinary, and generally accepted meaning." *TC Dallas #1*, 316 S.W.3d at 837.

## III. Analysis

Here, there is no dispute that the Parties entered into the License Agreement and that the G2 Purchase Order was submitted pursuant to the License Agreement. Both Parties also agree that the License Agreement is unambiguous. Thus, the Court finds that it may render a declaratory judgment regarding the Parties' rights and obligations under the License Agreement. *See TC Dallas #1*, 316 S.W.3d at 837.

ExxonMobil's Motion for Partial Summary Judgment concerns five issues of contractual interpretation that can be decided as a matter of law. Specifically, ExxonMobil seeks a declaration that, pursuant to the terms of the License Agreement and the G2 Purchasing Order: (1) EMRE is the "Licensee"; (2) EMRE is a "User"; (3) Gensym is required to generate permanent access codes for EMRE; (4) Gensym is required to provide EMRE with the ability to distribute annual access codes; and (5) each of the previous four statements remains true regardless of whether ExxonMobil and/or EMRE purchases Maintenance Services from Gensym.

### A. Whether EMRE is the "Licensee"

The first contract interpretation issue is EMRE's status as the Licensee.

The term "Licensee" is defined in the License Agreement as "any Affiliate or joint venture that issues an Order to Licensor as provided in the Agreement." (License Agreement at 5, Ex. A, § 17.) The relevant "Order" in this case is the G2 Purchase Order. Gensym argues that an issue of fact exists as to who issued the G2 Purchase Order because the Order itself lists "ExxonMobil Global Services Company Procurement on behalf of Purchaser" as the Procurement contact, and therefore more information is necessary in order to determine who issued the Order. (*See* GS Purchase Order at 1.) However, as ExxonMobil points out, the G2

Purchase Order was printed on EMRE letterhead, was to be invoiced to EMRE, and was to be delivered to EMRE. (*Id.*) After receiving the Purchase Order, Gensym issued an invoice referencing the G2 Purchase Order, which was billed to ERME and stated that the product subject to the G2 Purchase Order would be shipped to EMRE. (G2 Invoice, Dkt. No. 21, Ex. 3 at 1.) Counsel for Gensym also affirmed to the state court during a temporary injunction hearing that EMRE "issued a purchase order under Option 2. . . . It issues the purchase order on behalf of the entities." (Dkt. No. 21, Ex. 2 at 46:18–23.)

The Court finds that Gensym has failed to raise a genuine issue of material fact that any entity other than EMRE issued the G2 Purchase Order. Because EMRE issued the G2 Purchase Order to Gensym, EMRE is the "Licensee" as defined in the License Agreement.

### B. Whether EMRE is a "User"

The second contract interpretation issue concerns EMRE's status as a "User."

The License Agreement defines "User" as "any person who is enabled to be in actual Use of the Product running on a computer, whether that person is a stand-alone User or a network User." (License Agreement at 6, Ex. A, § 33.) "Use" means "to execute, access, employ, utilize[,] or display the Product." (*Id.* § 32.) The License Agreement further provides that Users are "[s]ubject to the qualifications contained on usage set forth in 3.3(d)" (*Id.* § 33), which reads as follows:

> Licensee may authorize any person to be a User as long as Licensee takes appropriate action to assure such User's Use is in compliance with the terms and conditions herein and such use is solely for the benefit of Licensee, Affiliates and Joint ventures. Licensee shall report in advance and in writing to Licensor any proposed use by contractors at off Site locations and Licensor shall have the right to reject such use.

(*Id.* at 8, Ex. B, § 3.3(d).) Finally, the License Grant contained in Section 3.1 provides that, "[u]nless otherwise expressly stated herein, upon acceptance of an Order and receipt of the

9

applicable license fee, Licensor grants to Licensee a perpetual, transferable (but only as expressly set forth in Section 3.4(a)), non-exclusive, worldwide, fee paid license to Use the Product . . . ." (*Id.* § 3.1.)

According to ExxonMobil, as the Licensee, EMRE has a "license to Use the Product" under the License Grant. Because EMRE is licensed to use the G2 Software Platform, EMRE therefore is a "User" under the License Agreement. In response, Gensym argues that the critical word in the definition of "User" in the License Agreement is "person." According to Gensym, "person" means "an actual flesh and blood human being," not a corporate entity. Because EMRE can only ever be in constructive use of the software through its corporate agents, Gensym maintains that EMRE cannot be a "User" under the License Agreement.

As stated above, unless a contract shows that the parties used a term "in a technical or different sense," the Court should give terms their plain, ordinary, and generally accepted meaning. *TC Dallas #1*, 316 S.W.3d at 837. Black's Law Dictionary defines "person" as "a human being" as well as "an entity (such as a corporation) that is recognized by law as having most of the rights and duties of a human being." BLACK'S LAW DICTIONARY (9th ed. 2009) (parenthetical in original). The License Agreement also adopts Texas law (License Agreement at 14, Ex. B, § 12.1) and specifically incorporates the Texas Uniform Commercial Code (TUCC) (*Id.* at 30, Ex. F, § 3(b)). The TUCC defines "person" as "an individual, corporation, . . . or any other legal or commercial entity." TEX. BUS. & COM. CODE § 1.201(b)(27). Because nothing in the License Agreement limits the definition of "person" to "an actual flesh and blood human being," the Court must construe "person" under its generally accepted legal meaning, which includes not only human beings but also corporate entities.

The Court finds that, as the Licensee, EMRE has a "license to Use the Product" under the License Agreement. Because EMRE is licensed to use the G2 Software Platform, EMRE is a "User" under the License Agreement. However, as Gensym correctly points out, EMRE's status as a "User" does not broaden its rights beyond the explicit limits in the License Agreement, and its use of the G2 Software Platform must be in compliance with the terms and conditions contained therein.[2] (*See* License Agreement at 8, Ex. B, § 3.3(d).)

### C. Whether Gensym is required to provide EMRE with permanent and/or annual access codes

The third and fourth contract interpretation issues concern Gensym's obligation to provide EMRE with permanent and/or annual access codes.

As stated above, ExxonMobil, through EMRE, purchased the G2 XOM Development Bundle, which is considered a "Product." The License Agreement provides that "'Product' shall include the media containing the software and any software or hardware components, including license files, keys, dongles or other security devices that are necessary to use, operate[,] or access the software." (License Agreement at 6, Ex. A, § 24.) According to Gensym, "[t]his definition certainly includes a single working access code[,] as that is all that is necessary to use the software." (Dkt. No. 20 at 17.) The section of the License Agreement entitled "Code Generation" further provides that "Gensym will provide EMRE with the ability to distribute annual license

---

2. Specifically, Gensym argues that EMRE is not allowed to use the G2 Software Platform outside of a process operating site—*i.e.*, petroleum refinery or chemical plant—unless ExxonMobil purchases Maintenance Services because ExxonMobil purchased a "Commercially restricted Corporate wide perpetual license for deployment at L3 Process Control LAN." (License Agreement at 23, Ex. D.) The L3 Process Control LAN is "a local area network [that] supports applications which directly interact with process control DCS." (*Id.* at 21.) Process control applications in turn are part of the "process control environment," which automates refining and chemical plants. Under Gensym's interpretation of the License Agreement, EMRE's rights were expanded to use the G2 Software Platform outside of process operating sites "for the development and support of site applications of G2," but only "as long as EMRE's CSS is current." (License Agreement at 23, Ex. D.) Thus, according to Gensym, EMRE is not prevented from using the G2 Software Platform if it is not paying for Maintenance Services; however, EMRE must limit its use to process operating sites. Because ExxonMobil did not move for summary judgment on this issue, the Court will not address it at this time.

codes for the G2 Development Bundle . . . . Permanent codes will be generated by Gensym."
(License Agreement at 20, Ex. C.)

Gensym appears to agree that it is required to provide ExxonMobil and/or EMRE with a
one-time access code under the License Agreement but claims that its obligation to provide any
further access codes is moot. According to Gensym, ExxonMobil has been in possession of a
permanent access code since before the License Agreement was even signed. Gensym also sent
ExxonMobil new permanent access codes on May 7, 2012 and then again on June 13, 2012.
(Dkt. No. 20, Exs. 16 & 22.) Unless ExxonMobil alters the way in which it is using the G2
Software—for example, by upgrading its system or changing the version of the software it is
running—Gensym claims that no further access codes are necessary, and to the extent
ExxonMobil seeks a new, updated, or upgraded permanent code, the generation of such a code is
considered part of Maintenance Services. Gensym further argues that temporary, annual access
codes are not included in the definition of Product quoted above, since such codes are not
"necessary to use, operate[,] or access the software" if the user has a permanent code, which
Gensym claims ExxonMobil now has.

In response to Gensym's claim that ExxonMobil has been in possession of a working
permanent access code since at least 2008, ExxonMobil offers the testimony of Gensym's CEO,
who testified that his investigation determined that Gensym had never provided a permanent
access code to ExxonMobil. (Cushman Dep, Dkt. No. 21, Ex. 6 at 104:7–105:7.) Gensym's
Director of Customer and Partnership Management also testified that he was not aware that
Gensym ever provided a permanent access code to ExxonMobil. (de Wit Dep., *Id.*, Ex. 7 at
91:17–92:7.) ExxonMobil concedes that Gensym provided ExxonMobil's Baton Rouge facility
with a permanent access code under a separate license agreement that predated the License

Agreement at issue; however, ExxonMobil states that the Baton Rouge facility was instructed to use the permanent code only at that facility. ExxonMobil further argues that the permanent code that was provided to the Baton Rouge facility is materially different from the annual access codes Gensym provided ExxonMobil pursuant to the License Agreement. Finally, ExxonMobil concedes that Gensym sent it a new permanent code after this lawsuit was filed, but argues that this does not render the case moot because, in response to Gensym's breach, ExxonMobil has made the decision to leave the G2 Software Platform "due to Gensym/Versata's attempted extortion and demonstrated unreliability." (Dkt. No. 21 at 10.) Because this will cost millions of dollars and make some of its previous expenditures worthless, ExxonMobil states that it intends to recover these costs.

The Court finds that Gensym is required to provide EMRE with whatever access codes are necessary to allow ExxonMobil to use the G2 Software Platform that it purchased pursuant to the License Agreement and G2 Purchase Order. To the extent Gensym opted in the past to provide EMRE with temporary annual access codes in lieu of one permanent access code, the License Agreement required Gensym to do so on a yearly basis, indefinitely. Whether Gensym actually provided ExxonMobil with a working permanent access code before this lawsuit was filed remains an issue of fact for a jury to decide.

### D. Whether EMRE's Status as a Licensee and User, and Gensym's Obligation to Provide Annual and/or Permanent Access Codes, are Conditioned on ExxonMobil Purchasing Maintenance Services from Gensym

The fifth contract interpretation issue concerns whether EMRE's status as a Licensee and User, or whether Gensym's obligation to provide EMRE with permanent and/or annual access codes, are conditioned on ExxonMobil purchasing Maintenance Services from Gensym.

The License Agreement defines "Maintenance Services" as "the support, enhancement[,] and repair of the Product as described in Exhibit C[,] which are provided by Licensor to Licensee under a subscription for a certain period." (License Agreement at 5, Ex. A, § 21.) Exhibit C to the License Agreement provides that Gensym's obligations with respect to Maintenance Services shall include:

- Providing corrections, patches, "bug fixes", troubleshooting[,] and modifications to eliminate non-conformities of the Product to the Specifications,
- Answering system support user and developer questions, [and]
- Providing Enhanced Product and other routine improvements, or new versions of the Product that Licensor generally makes available to its licensees.

(*Id.* at 20, Ex. C.) The License Agreement further provides that:

**Scope.** Licensor agrees to provide to Licensee all Maintenance Services for the Product during the Warrant period and thereafter provided that the Licensee has submitted an Order for Maintenance Services and paid the annual maintenance fee. Product fees include one initial year of Maintenance Services, and annual renewal of Maintenance Services I optional thereafter.

* * *

**Support Optional.** Licensee may elect, at its sole option and discretion, to obtain or discontinue Maintenance Services from Licensor at any time. . . .

(*Id.* at 11, Ex. B, §§ 6.1, 6.6.) There is no provision in the License Agreement or G2 Purchase Order that conditions the provision of annual and/or permanent access codes on ExxonMobil's paying for Maintenance Services. Likewise, there is no provision in the License Agreement or G2 Purchase Order that nullifies EMRE's status as a Licensee and/or User if ExxonMobil is not paying for Maintenance Services.

The Court finds that EMRE's status as a Licensee and User under the License Agreement, as well as Gensym's obligation to provide EMRE with whatever access codes are necessary to allow ExxonMobil to use the G2 Software Platform it purchased pursuant to the License Agreement and G2 Purchase Order, are not conditioned on ExxonMobil purchasing

optional Maintenance Services. However, Gensym is not required to provide EMRE with upgraded codes, codes for new software versions, or replacement codes, unless ExxonMobil purchases Maintenance Services from Gensym.

**V. Conclusion**

For the aforementioned reasons, ExxonMobil's Motion for Partial Summary Judgment (Dkt. No. 11) is **GRANTED**, and it is hereby **DECLARED** that, pursuant to the terms of the License Agreement and the G2 Purchase Order:

(1) EMRE is the "Licensee";

(2) EMRE is a "User";

(3) Gensym is required to provide EMRE with whatever access codes are necessary to allow ExxonMobil to use the G2 Software Platform; and

(4) Each of the previous three statements remains true regardless of whether ExxonMobil purchases maintenance services from Gensym.

However, the above findings do not resolve the disputed issue of whether EMRE is entitled to use the G2 Software Platform outside of a process operating site unless ExxonMobil purchases Maintenance Services from Gensym. This issue was not the subject of ExxonMobil's Motion for Partial Summary Judgment and therefore will not be decided at this time. Likewise, the issue of whether Gensym actually provided ExxonMobil with a working permanent access code before this lawsuit was filed remains an issue of fact for the jury.

It is so **ORDERED**.

**SIGNED** this 26th day of March, 2013.


_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE